J-A18034-25                    2026 PA Super 175

BEVIN NEWLIN AND STACEY         :    IN THE SUPERIOR COURT OF
LOEHRS, AS CO-ADMINISTRATORS    :         PENNSYLVANIA
OF THE ESTATE OF PATRICIA       :
O'DONNELL, DECEASED             :
                                :
                                :
         Appellants             :
                                :
                                :
                                :
         v.                     :    No. 259 EDA 2024
                                :
                                :
VITA HEALTHCARE GROUP, BRINTON  :
MANOR CENTER SNF, LLC F/D/B/A   :
BRINTON MANOR NURSING AND       :
REHABILITATION CENTER,          :
LIGHTNING HEALTH HOLDCO, LLC,   :
IMPERIAL HEALTHCARE GROUP, LLC, :
BM REHAB AND NURSING CENTER,    :
LLC D/B/A BRINTON MANOR         :
NURSING AND REHABILITATION      :
CENTER, BH OPCO HOLDCO, LLC,    :
IMPERIAL HEALTHCARE SERVICES,   :
LLC, AND CHAIM STEG             :

Appeal from the Judgment Entered June 7, 2024
In the Court of Common Pleas of Delaware County Civil Division at
No(s):  CV-2020-008216

BEVIN NEWLIN AND STACEY         :    IN THE SUPERIOR COURT OF
LOEHRS, AS CO-ADMINISTRATORS    :         PENNSYLVANIA
OF THE ESTATE OF PATRICIA       :
O'DONNELL, DECEASED             :
                                :
                                :
                                :
         v.                     :
                                :
                                :    No. 260 EDA 2024
                                :
VITA HEALTHCARE GROUP, BRINTON  :
MANOR CENTER SNF, LLC F/D/B/A   :
BRINTON MANOR NURSING AND       :
REHABILITATION CENTER,          :
LIGHTNING HEALTH HOLDCO, LLC,   :
IMPERIAL HEALTHCARE GROUP, LLC, :
BM REHAB AND NURSING CENTER,    :

LLC D/B/A BRINTON MANOR         :
NURSING AND REHABILITATION      :
CENTER, BH OPCO HOLDCO, LLC,    :
IMPERIAL HEALTHCARE SERVICES,   :
LLC, AND CHAIM STEG             :
                                :
                                :
                                :
APPEAL OF: BM REHAB AND         :
NURSING CENTER, LLC D/B/A       :
BRINTON MANOR NURSING AND       :
REHAB CENTER                    :

Appeal from the Judgment Entered June 7, 2024
In the Court of Common Pleas of Delaware County Civil Division at
No(s):  CV-2020-008216

BEVIN NEWLIN AND STACEY         :    IN THE SUPERIOR COURT OF
LOEHRS, AS CO-ADMINISTRATORS    :          PENNSYLVANIA
OF THE ESTATE OF PATRICIA       :
O'DONNELL, DECEASED             :
                                :
                                :
                                :
             v.                 :
                                :
                                :    No. 284 EDA 2024
                                :
VITA HEALTHCARE GROUP, BRINTON  :
MANOR CENTER SNF, LLC F/D/B/A   :
BRINTON MANOR NURSING AND       :
REHABILITATION CENTER, IMPERIAL :
HEALTHCARE GROUP, LLC, IMPERIAL :
HEALTHCARE SERVICES, LLC, BM    :
REHAB AND NURSING CENTER, LLC   :
D/B/A BRINTON MANOR NURSING     :
AND REHABILITATION CENTER,      :
LIGHTNING HEALTH HOLDCO, LLC,   :
BH OPCO HOLDCO AND CHAIM STEG   :
                                :
                                :
                                :
APPEAL OF: BRINTON MANOR        :
CENTER SNF, LLC F/D/B/A BRINTON :
MANOR NURSING AND               :
REHABILITATION CENTER           :

Appeal from the Judgment Entered June 7, 2024

- 2 -

In the Court of Common Pleas of Delaware County Civil Division at
No(s): CV-2020-008216

| | | |
|---|---|---|
| BEVIN NEWLIN AND STACEY LOEHRS, AS CO-ADMINISTRATORS OF THE ESTATE OF PATRICIA O'DONNELL, DECEASED | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| | : | No. 654 EDA 2024 |
| VITA HEALTHCARE GROUP, BRINTON MANOR CENTER SNF, LLC F/D/B/A BRINTON MANOR NURSING AND REHABILITATION CENTER, IMPERIAL HEALTHCARE GROUP, LLC, IMPERIAL HEALTCARE SERVICES, LLC, BM REHAB AND NURSING CENTER, LLC D/B/A BRINTON MANOR NURSING AND REHABILITATION CENTER, LIGHTNING HEALTH HOLDCO, LLC, BH OPCO HOLDCO AND CHAIM STEG | : : : : : : : : : : : : : : | |
| APPEAL OF: BRINTON MANOR CENTER SNF, LLC F/D/B/A BRINTON MANOR NURSING AND REHABILITATION CENTER | : : : : : | |

Appeal from the Judgment Entered June 7, 2024
In the Court of Common Pleas of Delaware County Civil Division at
No(s): CV-2020-008216

| | | |
|---|---|---|
| BEVIN NEWLIN AND STACEY LOEHRS, AS CO-ADMINISTRATORS OF THE ESTATE OF PATRICIA O'DONNELL, DECEASED | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| | : : | No. 660 EDA 2024 |
| | : | |

VITA HEALTHCARE GROUP, BRINTON :
MANOR CENTER SNF, LLC F/D/B/A :
BRINTON MANOR NURSING AND :
REHABILITATION CENTER, IMPERIAL :
HEALTHCARE GROUP, LLC, IMPERIAL :
HEALTHCARE SERVICES, LLC, BM :
REHAB AND NURSING CENTER, LLC :
D/B/A BRINTON MANOR NURSING :
AND REHABILITATION CENTER, :
LIGHTNING HEALTH HOLDCO, LLC, :
BH OPCO HOLDCO AND CHAIM STEG :
                              :
                              :
APPEAL OF: BRINTON MANOR :
CENTER SNF, LLC F/D/B/A BRINTON :
MANOR NURSING AND :
REHABILITATION CENTER

Appeal from the Judgment Entered June 7, 2024
In the Court of Common Pleas of Delaware County Civil Division at
No(s): CV-2020-008216

BEFORE: OLSON, J., DUBOW, J., and McLAUGHLIN, J.

OPINION BY DUBOW, J.:                 **FILED AUGUST 4, 2026**

In these cross-appeals, Appellants, Bevin Newlin and Stacey Loehrs, co-administrators of the Estate of Patricia O'Donnell ("Decedent") (collectively, "Estate"); Cross-Appellants, Vita Healthcare Group ("Vita") and Brinton Manor SNF, LLC f/d/b/a Brinton Manor Nursing & Rehabilitation Center ("BM-SNF") (collectively, "Vita Entities"); and Cross-Appellants, Imperial Healthcare Group, LLC, Imperial Healthcare Services, LLC ("Imperial"), and BM Rehab and Nursing Center, LLC d/b/a Brinton Manor Nursing and Rehabilitation Center ("BM Rehab") (collectively "Imperial Entities"), appeal from the June 7, 2024 judgment entered in the Delaware County Court of Common Pleas in

- 4 -

this nursing home negligence action. During the relevant time, BM-SNF and BM Rehab were the operators of the nursing home (collectively referred to as "Operating Company Defendants") and Imperial and Vita provided management services (collectively referred to as "Management Company Defendants"). After careful review, we:

1. Affirm the trial court's grant of a motion for JNOV in favor of the Management Company Defendants;[1]

2. Affirm the trial court's denial of the Operating Company Defendants Motion for JNOV on sufficiency of the evidence grounds;

3. Affirm the trial court's denial of the Operating Company Defendants' Motion for a New Trial based on evidentiary challenges;

4. Reverse the trial court's denial of the Operating Company Defendant's Motion for a New Trial and remand for a new trial on compensatory damages; and

5. Reverse the trial court's denial of the Operating Company Defendants' Motion to Vacate the Punitive Damages Award.[2]

_____

[1] We note that we are troubled by the poor care that the various entities provided to Decedent; we, however, are constrained, to affirm the trial court's grant of a JNOV in favor of the Management Company Defendants because the Estate failed to establish corporate liability against them as a matter of law. This is not an indication, however, that we sanction the Management Company Defendants' conduct.

[2] Richard Scampone and The Pennsylvania Association of Justice have filed *amicus* briefs regarding these cross-appeals.

The relevant facts and procedural history, as gleaned from our review of the record, are as follows. In early 2018, Decedent, who suffered from health problems, began to experience increased difficulty in managing her diabetes, resulting in decreased mobility and exposing her to an increased risk of falling. Because of these safety concerns, on March 18, 2018, Decedent became a resident of Brinton Manor Nursing and Rehabilitation Center ("Brinton Manor"),[3] which, at the time, was owned by an entity called Genesis.[4]

On June 1, 2018, BM-SNF purchased Brinton Manor from Genesis and contracted with Vita to manage the facility. On July 1, 2019, 21 days prior to Decedent's final day of residency at Brinton Manor, BM Rehab purchased Brinton Manor from BM-SNF and Imperial assumed management responsibilities.[5] A licensed nursing home administrator was in place at Brinton Manor at all relevant times.

_____

[3] Decedent remained a resident of Brinton Manor until July 21, 2019.

[4] Genesis is not a party to this action.

[5] By way of background, the management agreements required, *inter alia*, the Management Company Defendants to prepare a budget for operating the facility for the Operating Company Defendants' approval and to provide various services for the operation of the facility including pharmacy, consults, resident relations, maintaining visibility of a management presence, helping with personnel, and service contracts. **See** N.T., 1/18/23, at 123-25, 127-28. In exchange for providing these services, BN-SNF paid Vita more than $432,000 in management fees and for the fiscal year 2019, BM Rehab paid Imperial $484,000. **Id.** at 125-26, 128.

In December 2018, Decedent fell, fractured her hip, and required surgery. Brinton Manor staff documented the fall and created an event report that Brinton Manor's director of nursing, Bridget Alvanos, filed with the Pennsylvania Department of Health that represented that the care plan in place for Decedent was appropriate at the time of her fall. When Decedent returned to Brinton Manor after her surgery, its staff evaluated Decedent and updated her care plan.

Following her fall, Decedent's general condition began to worsen, including Decedent suffering from anxiety, depression, malnutrition, and skin deterioration, which caused her to develop a painful stage-four sacral wound. Decedent required extensive assistance from at least two staff members for services such as bed mobility, turning and repositioning in bed, transferring into and out of bed to a chair, toilet use, and personal hygiene. As a result of Decedent's increased level of anxiety and depression—conditions which Brinton Manor's nurses and physical therapists documented in Decedent's records—Decedent was transferred to an inpatient psychiatric facility for a short period of time. She returned to Brinton Manor on March 12, 2019. Brinton Manor's records reflect that, after her return to Brinton Manor, Decedent remained anxious, particularly about falling, and was incontinent of bowel and bladder, but had no skin breakdown.

In April 2019, Decedent again suffered a fall. Around the same time, a dietician noted in Brinton Manor's records that Decedent was losing weight and she had lost her dentures. Records also reflect that around June and July

2019, Decedent required at least one skilled intervention because she did not have dentures and, thus, was unable to chew certain foods. Brinton Manor's dietitian recommended that Decedent receive nutritional supplements, and a staff member referred Decedent to speech and occupational therapy.

Meanwhile, in May 2019, Decedent developed pressure ulcers and Brinton Manor's records reflect, and Decedent's family reported to staff, that Decedent was in pain. A wound physician, who was an independent contractor, saw Decedent weekly, and her pressure wounds had healed by July 2, 2019.[6]

Decedent developed additional pressure wounds, however, and, on July 21, 2019, an ambulance transported her to Riddle Hospital for treatment for an infected, stage-four sacral wound. Eventually, the pain caused by the sacral wound became difficult to manage due to the wound's location and extent, resulting in Decedent's placement on hospice on August 1, 2019, and death on August 5, 2019. The Delaware County medical examiner concluded that Decedent's immediate cause of death was hydromorphone intoxication due to the palliative care that she received while receiving hospice care, and

_____

[6] The wound care physician who treated Decedent testified that he did not have any concerns that Brinton Manor had not taken proper steps to prevent Decedent from developing facility-acquired pressure wounds or that Decedent had not received proper care from the nursing staff. N.T., 11/18/23, at 321.

the proximate cause of her death was complications from the sacral decubitus ulcer.[7]

During the time Decedent resided at Brinton Manor, the facility received citations for various deficiencies, including deficiencies for care planning, nutrition, hydration, and pain management; none of the deficiencies, however, were based on the care provided to Decedent.

On December 14, 2020, the Estate initiated this nursing home negligence case, alleging that, while she was a resident Brinton Manor, Decedent sustained a series of injuries that ultimately resulted in her death. The Estate alleged that, *inter alia*, changes in ownership and management of Brinton Manor, high turnover in administration and nursing staff, and lack of implementation of nursing policies and procedures affected the continuity of Decedent's care. The Estate alleged claims of negligence (through vicarious liability) and corporate negligence against all the Defendants. The Estate sought compensatory and punitive damages under Pennsylvania's wrongful death and survival statutes.

Following discovery, the parties filed numerous motions *in limine*, including, on December 1, 2022, the Defendants' joint motions to preclude the Estate from admitting into evidence certain Pennsylvania Department of Health Survey Reports ("Survey Reports") and the "Nursing Home Compare"

---

[7] A Riddle Hospital doctor's records reported Decedent's cause of death as sepsis, osteomyelitis, and severe protein malnutrition.

Five-Star Ratings Profile ("Profile Evidence") derived from the Medicare.gov website.

On January 3, 2023, the trial court entered orders denying both motions *in limine*, explaining that the contested evidence was relevant to the Estate's corporate negligence claims. Trial Ct. Order, 1/3/23, at 2. The court further agreed with the Estate that "any 'unfair prejudice' to [the Defendants] . . . can be cured with a limiting instruction to the jury." **Id.** at 3. Furthermore, the court left open the opportunity for the Defendants to object on a different basis at trial. **Id.**

Trial commenced with jury selection on January 17, 2023. Relevant to the instant appeal, the Estate presented the testimony of numerous witnesses, including expert testimony from nurse Suzanne Frederick, who testified regarding standard-of-care and breaches thereof; Ernest Tosh, J.D., by videotaped deposition, regarding staffing analysis and cost-reporting analysis for nursing homes, and Dr. David Seignious, an expert in internal medicine and geriatrics, regarding, *inter alia*, the cause of Decedent's death.

On February 2, 2023, the jury returned a verdict of $4,000,000 in compensatory damages in favor of the Estate. In particular, the jury awarded the Estate:

- $600,000 from BM-SNF

- $2,400,000 from Vita

- $800,000 from BM Rehab

- $200,000 from Imperial.

The jury also assessed $15,000,000 in punitive damages. In particular, the jury imposed the following punitive damages:

- $5,000,000 against BM-SNF

- $6,500,000 against Vita

- $2,000,000 against BM Rehab

- $1,500,000 against Imperial.

On February 6, 2023, the Defendants filed post-trial motions raising numerous grounds for relief.

On June 6, 2023, the trial court held a hearing on the post-trial motions. Notably, and crucial to our analysis, counsel for the Estate clarified which theory of liability the Estate asserted against the Management Company Defendants and which theory it asserted against the Operating Company Defendants. In particular, counsel informed the court that the Estate was only pursuing a theory of corporate negligence against the Management Company Defendants and not pursuing a claim of negligence based on vicarious liability. Against the Operating Company Defendants, the Estate informed the trial court that it was only pursuing a claim of vicarious liability. *See* N.T., 6/6/23, at 182-83.) (where the Estate's counsel explains that "to be clear, the [M]anagement [Company Defendants] were always just corporate negligence or direct negligence and then the [Operating Company Defendants] had vicarious [liability]. For punitives we had conceded we were only seeking for the direct [(corporate)] negligence for all four [Defendants].") In other words, counsel for the Estate clarified that it was only pursuing a theory of vicarious

- 11 -

liability against the Operating Company Defendants and a theory of corporate negligence against the Management Company Defendants.

Following its consideration of the arguments presented in the parties' motions and briefs, and the above clarification by the Estate's counsel, the trial court granted post-trial motions in part. In particular, the trial court granted the motion for JNOV in favor of the Management Company Defendants on the grounds that the ***Scampone*** cases[8] precluded the Estate as a matter of law from establishing corporate liability against the Management Company Defendants. It found that, since counsel for the Estate informed the trial court that it was not pursuing a theory of vicarious liability against the Management Company Defendants, and the Estate could not as a matter of law pursue a theory of corporate negligence against the Management Company Defendants, the Estate failed to establish any legal liability against the Management Company Defendants and, thus, the Management Company Defendants were entitled to JNOV as a matter of law.

The court, however, denied the motions for JNOV that the Operating Company Defendants filed, concluding that the Estate had established that the Operating Company Defendants were vicariously liable for the negligence of their employees.

---

[8] ***Scampone v. Highland Park Care Center, LLC***, 57 A.3d 582 (Pa. 2012) and ***Scampone v. Grane Healthcare, Co.***, 169 A.3d 600 (Pa. Super. 2017), discussed *infra*.

The trial court also remitted the jury's assessment of punitive damages against BM Rehab from $2,000,000 to $385,000, based on its finding that "the $2,000,000 punitive damages award . . . is grossly excessive and shocks the [c]ourt's sense of justice." Trial Ct. Op., 1/3/24, at 41. The trial court reasoned that since BM Rehab only provided services to the Decedent for 21 days, a reasonable punitive damage award should reflect the *pro rata* time that BM Rehab provided services to the Decedent.[9] *Id.*

On January 3, 2024, the trial court entered an order molding the verdict. Following the entry of judgment, the parties filed appeals and cross-appeals.

The Estate raises the following three issues on appeal:

1. Did the trial court err in granting [JNOV] on [the Estate's] negligence claims against Vita []?

2. Did the trial court err in granting [JNOV] on [the Estate's] negligence claims against Imperial []?

3. Did the trial court err in remitting the punitive damages award against BM Rehab?

Estate's Br. at 5.

The Vita Entities raise the following two issues as cross-appellants:

1. Did the trial court correctly grant JNOV in Vita's favor on [the Estate's] negligence claims after [the Estate] renounced any claim for vicarious liability, failed to prove that Vita owed, let alone breached, a duty under *Thompson v. Nason* that caused Decedent's harm and, accordingly, failed to establish a basis for corporate negligence against Vita?

_____

[9] The court also awarded the Estate $201,205.48 in delay damages.

- 13 -

2. Did the trial court correctly grant JNOV in Vita's favor on [the Estate's] negligence claims after [the Estate] failed to adduce expert testimony to support a corporate negligence claim against Vita?

Brief of Vita and BM-SNF ("Vita Entities' Br.") at 1-2.

Imperial raises the following two issues as cross-appellant:

1. Whether the trial court correctly granted JNOV and vacated the judgment against Imperial after [the Estate]: (i) failed to prove that Imperial was liable under a corporate negligence theory and (ii) expressly renounced any vicarious liability claims against this consulting company?

2. Whether the trial court correctly remitted the punitive damages award against BM Rehab [] where the evidence did not support the original excessive and shocking $2 million punitive damages award, particularly where BM Rehab [] was only involved with the facility for 21 days during Decedent's stay?

Brief of Imperial and BM Rehab ("Imperial Entities' Br.") at 5.

BM-SNF raises the following issues as cross-appellant:

1. Did the trial court err in denying BM-SNF['s] request for JNOV in circumstances where [the Estate] waived and/or abandoned any corporate negligence claim against this operator and also failed to prove a basis for vicarious liability against it?

2. Did the trial court err in denying [BM-SNF's] request to vacate or dramatically reduce the punitive damages award in circumstances where [the Estate] failed to establish the level of wanton and willful conduct to justify an award of punitive damages against this entity and where, in any event, the amount of the punitive damages award was excessive?

3. Did the trial court err in denying [BM-SNF's] request for a new trial, either because two of four defendants were dismissed from the case and the liability previously apportioned to those dismissed defendants was reapportioned inconsistent with the jury's verdict, usurping its role, in a manner fundamentally unfair to the two remaining [d]efendants, or else because the trial court erroneously admitted evidence of the "Nursing Home Compare" Five-Star Rating Profile and Department of Health Survey Reports?

Vita Entities' Br. at 29-30 (emphasis omitted).

BM Rehab raises the following issues as cross-appellant:

1. Whether the trial court erred in denying BM Rehab['s] request for JNOV in circumstances where [the Estate] admitted that they did not pursue a corporate negligence claim against BM Rehab[] and failed to prove a basis for vicarious liability against this entity?

2. Whether the trial court erred in denying BM Rehab['s] request to vacate the punitive damages award where [the Estate] failed to establish the necessary wanton and willful conduct by BM Rehab[] to warrant such extraordinary damages, and an amount of punitive damages in any measure was not justified?

3. Whether the trial court erred in denying BM Rehab['s] request for a new trial where the judgment against two of four [d]efendants was vacated, and the trial court entered judgment in the full compensatory amount against the remaining two [d]efendants, thereby imposing on them a higher judgment (dollar-wise) than that which the jury intended?

4. Whether the trial court erred in denying BM Rehab['s] request for a new trial to ameliorate the prejudice caused when the trial court impermissibly admitted irrelevant, prejudicial, and hearsay evidence of a "Nursing Home Compare" Five-Star Rating Profile and Department of Health Survey Report that was issued prior to BM Rehab's operation of the facility?

Imperial Entities' Br. at 39-40.

***

Standard of Review for Trial Court's Grant and Denial of Motion for JNOV

Each of the parties raise issues challenging the trial court's disposition of the various motions for entry of JNOV. "We review the [grant or] denial of a request for JNOV for an error of law that controlled the outcome of the case or an abuse of discretion." *Caranci v. Monsanto Co.*, 338 A.3d 151, 160

(Pa. Super. 2025). "In this context, an abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or ill-will." *Id.* (citation and internal quotation marks omitted).

There are two bases upon which a movant is entitled to JNOV: "one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Rohm and Haas Co. v. Continental Cas. Co.*, 781 A.2d 1172, 1176 (Pa. 2001) (citation omitted). Here, the trial court determined that the Management Company Defendants were entitled to JNOV as a matter of law.

\*\*\*

<u>Entry of JNOV in favor of the Management Company Defendants</u>

In this case, the Estate pursued only a theory of corporate negligence, and not one of vicarious liability, against the Management Company Defendants. The trial court granted JNOV in favor of the Management Company Defendants, reasoning that as a matter of law, the theory of corporate negligence only applies to the Operating Company Defendants and not the Management Company Defendants. Since the Estate only pursued a corporate negligence theory against the Management Company Defendants, the trial court concluded that it properly granted the motion for JNOV in their favor. We agree.

The Pennsylvania Supreme Court first adopted a theory of corporate liability against a healthcare provider in **Thompson v. Nason Hosp.**, 591 A.2d 703 (Pa. 1991). The Supreme Court explained the concept as a "doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital." **Id.** at 707. The Supreme Court categorized the scope of that duty into four categories:

1. A duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

2. A duty to select and retain only competent physicians;

3. A duty to oversee all persons who practice medicine within its walls as to patient care; and

4. A duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

**Id.** (formatting altered and internal citations omitted) (the "**Thompson** duties"). The Supreme Court highlighted that this "theory of liability creates a nondelegable duty which the hospital owes directly to a patient." **Id.**

In 2012, the Pennsylvania Supreme Court addressed the applicability of corporate liability and the **Thompson** duties to a nursing home in **Scampone v. Highland Park Care Center, LLC**, 57 A.3d 582 (Pa. 2012) ("**Scampone II**"). In **Scampone II**, the plaintiff attempted to extend corporate liability to the operator of a skilled nursing facility and an affiliated management company. The Supreme Court agreed that a nursing home could be subject

- 17 -

to corporate liability, holding that "a nursing home and affiliated entities are subject to potential direct liability for negligence, where the requisite resident-entity relationship exists to establish that the entity owes the resident a duty of care." *Id.* at 584. The Supreme Court found that if the "requisite resident-entity relationship" exists to create a duty, the scope of the duty includes duties "such as duties to maintain safe facilities[] and to hire and oversee competent staff." *Id.* at 598.[10] The Supreme Court remanded the case back to the trial court to determine "whether the requisite relationship exists between the respective parties" and "any specific duties owed by [the nursing home operator] or [the nursing home management company] to residents like Ms. Scampone." *Id.* at 607.

Upon remand, the trial court, *inter alia*, re-entered a compulsory non-suit in favor of Grane Healthcare Company, the management company, on the grounds that the management company had only agreed to provide services to the operating company and had not agreed to provide care and treatment to the plaintiff; rather it was the nursing home operator that agreed to provide services to the plaintiff and thus, the entity with the non-delegable duty to the

---

[10] The Supreme Court acknowledged that a plaintiff can also assert the theory of vicarious liability against a nursing home entity in addition to a theory of corporate liability. *Id.* at 597-98. For a comprehensive and well-defined explanation of the differences between corporate liability and vicarious liability for a medical facility, see the concurring opinion issued by Judge Olson in *Corey v. Wilks Barre Hospital Company, LLC*, 307 A.3d 701, 716-28 (Pa. Super. 2023)(*en banc*)

plaintiff. ***Scampone v. Grane Healthcare, Co.***, 169 A.3d 600, 609-10 (Pa. Super. 2017) ("***Scampone III***").

The plaintiff appealed. The Superior Court first interpreted the Supreme Court's holding in ***Scampone II*** as "indicating that **both** Grane [the management company] and Highland [the operating company] could not be held liable under a direct corporate negligence theory . . . ." ***Id.*** at 609 (emphasis added). The Superior Court, in reaching this conclusion, relied on the Supreme Court's finding that the "inquiry [about the corporate entity's relationship to the plaintiff] is individual to each appellant, although the duties of appellants may be similar. This type of individualized inquiry into appellants' duties of care ensures that multiple entities are not exposed to liability for breach of the same non-delegable duties."[11] ***Id.*** at 608 (citation omitted).

Applying these principles to the facts of ***Scampone III***, the Superior Court found that the operating company was the licensed owner and occupier of "the nursing home facility and, by virtue **of its direct contractual relationship with [the plaintiff] to render her care**, [the nursing home operator] could be subject to any applicable non-delegable duty for a cause of action in direct corporate negligence as outlined in ***Thompson***." ***Id.*** at 621

_____

[11] We agree with the Court in ***Scampone III*** that the term "non-delegable duties is a misnomer" because the nursing home operator may delegate the "performance" of its ***Thompson*** duties to another entity and, thus, the performance of the duty is delegable. ***Id.*** at 621. The term actually means that even if an entity delegates the performance of its duty, it is still liable if the other entity breaches that duty. ***Id.***

(emphasis added). This Court subsequently held, in **Hopkins v. Compass Point Healthcare System, LLC**, a case where, as in the instant case, the nursing home resident had a contractual agreement with only one entity, that "**Scampone II** and **Scampone III** make clear that **only one entity** can be liable in corporate negligence for a non-delegable duty to a nursing home patient." 2021 WL 3465831 at *6 (Pa. Super. filed Aug. 6, 2021) (non-precedential decision) (citing **Scampone II**, 57 A.3d at 606-07; **Scampone III**, 169 A.3d at 621). In other words, as a matter of law, when it is only the operator of a nursing home that has the contractual relationship with the plaintiff, only the operator of the nursing home can be held liable under a theory of corporate liability, even if the operator delegates the performance of its **Thompson** duties to a management company.[12]

In the instant case, it was the Operating Company Defendants who contracted directly with Decedent. The Operating Company Defendants also entered into management agreements with the Management Company Defendants that required, *inter alia*, the Management Company Defendants to prepare a budget for operating the facility for the Operating Company Defendants' approval and to provide various services for the operation of the facility including pharmacy, consults, resident relations, maintaining visibility

---

[12] We note that this principle does not preclude a management company from being held liable under a theory of vicarious liability. **Scampone II**, 57 A.3d 597-98.

of a management presence, helping with personnel, and service contracts. **See** N.T., 1/18/23, at 123-25, 127-28.

In light of the **Scampone** holdings and the fact that it was only the Operating Company Defendants that had a direct contractual relationship with Decedent, we find that it was the Operating Company Defendants that undertook the duties set forth in **Thompson**. Although the Operating Company Defendants delegated the performance of those duties to the Management Company Defendants through the management contracts, the duties were "non-delegable," and the Operating Company Defendants are still liable for a breach of those duties. **Scampone III**, 169 A.3d at 621. Thus, the trial court properly found that the Estate as a matter of law could not establish a theory of corporate liability against the Management Company Defendants because they did not have a direct contractual relationship with Decedent.

The Estate argues that the trial court erred because its interpretation of **Scampone** permits the imposition of corporate liability on both an operator and management company of a nursing home. Appellants' Brief at 14-61. In support of this claim, the Estate asserts, *inter alia*, that the **Scampone** decisions do not preclude the Management Company Defendants as a matter of law from having potential liability to the Estate independent from the Operating Company Defendants' liability because the Estate proceeded against the Management Company Defendants as joint tortfeasors and the

Estate "produced ample evidence regarding the direct negligence of both Management Entities." *Id.* at 33, 50-52, 55-56, 58-60.

The Estate's argument, however, ignores the **Scampone** holdings that make clear that the corporate duties set forth in **Thompson** are imposed only on the corporate entity with whom the plaintiff has a contractual relationship, *i.e.*, a direct relationship. **Scampone II**, 57 A.3d at 584, 606-07; **Scampone III**, 169 A.3d at 620-21. Once that entity assumes those duties, that entity is still liable even if it delegates the performance of those duties to a different entity. **Scampone III**, 169 A.3d at 621. The Supreme Court clearly and unequivocally held that it is necessary to determine which entity or entities has the "requisite" relationship with the plaintiff and it is that entity or entities, that can be held liable for a breach of the **Thompson** duties. **Scampone II**, 57 A.3d at 584, 607. Similarly, the Superior Court in **Scampone III** explicitly imposed the **Thompson** duties on the operator of the nursing home because it was the operator that had the contractual relationship with the plaintiff.

We further note that the Estate bases its argument on the premise that "[w]hen entering jnov in favor of [Management Company Defendants], the trial court acknowledged that the record contained evidence to sustain a duty of care." Estate's Br. at 27. While this may be true, the Estate overlooks that it admitted it only pursued a claim of corporate liability against the Management Company Defendants and, as discussed above, as a matter of law the Management Company Defendants cannot owe a duty to the Decedent under a corporate liability theory absent a contractual relationship with

- 22 -

Decedent.  While the Management Company Defendants might have owed a duty of care to the Decedent through a theory of vicarious liability, the Estate ultimately chose not to pursue that theory and, thus, its joint tortfeasor argument fails

In sum, we find that the trial court properly concluded that there is no legal basis to impose corporate negligence against the Management Company Defendants.  Therefore, the court properly entered JNOV in favor of the Management Company Defendants.

*** 

Denial of JNOV in favor of the Operating Company Defendants

We next address the contention of the Operating Company Defendants that the trial court erred in refusing to grant JNOV in their favor.  The Operating Company Defendants first claim that they are entitled to judgment as a matter of law because the Estate either waived or abandoned their corporate negligence claims and failed to prove that the Operating Company Defendants were vicariously liable to the Estate.  Vita's Br. at 33-43, Imperial's Br. at 43-48.  Although we agree that the Estate did not pursue a corporate negligence claim against the Operating Company Defendants, it did pursue one based on vicarious liability, and we find that the evidence supported a verdict based on vicarious liability.

We will affirm the trial court's order denying JNOV where the plaintiff adduced sufficient competent evidence to sustain the verdict.  ***See Ruff v. York Hosp.***, 257 A.3d 43, 48 (Pa. Super. 2021).  A trial court may only grant

JNOV "in clear cases where the facts are such that no two reasonable minds could fail to agree that the verdict was improper." *Id.* at 48-49. We resolve any conflict in the evidence in the verdict-winner's favor." *Id.* at 48.

"An employer is held vicariously liable for the negligent acts of his employee which causes injuries to a third party, provided that such acts were committed during the course of and within the scope of employment." *D'Errico v. DeFazio*, 763 A.2d 424, 431 (Pa. Super. 2000) (citation omitted). In other words, "the corporation's liability is derivative of the agents' breach of their duties of care to the plaintiff." *Scampone II*, 57 A.3d at 598. This means that,

> in its simplest form[], by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it. Once the requisite relationship (*i.e.*, employment, agency) is demonstrated, the innocent victim has recourse against the principal[.]

*Id.* (internal quotation marks and citations omitted).

In addition to establishing that a corporate agent or employee acted negligently, a plaintiff must also demonstrate that the employee owed a duty to the plaintiff or plaintiff's decedent, that the employee breached the duty, that the breach proximately caused the harm suffered, and that the plaintiff's damages were a direct result of the harm. *See Nigon v. Jewell*, 313 A.3d 1124, 1133 (Pa. Super. 2024). Where, as here, the plaintiff raises claims of medical or nursing home negligence, "there is also the added requirement that

the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation." *Id.* (citation omitted).

In particular, the Operating Company Defendants claim that they are entitled to JNOV because the Estate did not establish the identity of any specific employees involved in Decedent's care, show that they breached the standard of care, demonstrate that the breach caused Decedent's harm, or present the requisite medical testimony to prove their claim. Vita Entities' Br. at 34-36; Imperial Entities' Br. at 43, 45-48.

We reject this argument. This Court has held that a plaintiff can establish her right to recovery on a vicarious liability claim even if she does not base that claim on the actions of an individual, specific staff member. *See Sokolsky v. Eidelman*, 93 A.3d 858, 865 (Pa. Super. 2014) (explaining that "[s]imply because employees are unnamed within a complaint or referred to as a unit, *i.e.*, the staff, does not preclude one's claim against their employer under vicarious liability if the employees acted negligently during the course and within the scope of their employment"); *see also Breslin v. Mountain View Nursing Home, Inc.*, 171 A.3d 818, 828 (Pa. Super. 2017) (same). Accordingly, the Operating Company Defendants' claim that the Estate failed to establish their vicarious liability because the Estate did not specifically identify which of their employees or agents acted negligently lacks merit.[13]

_____

[13] The trial court also aptly noted that the burden was on the Operating Company Defendants to request that the verdict slip contain line items for the
*(Footnote Continued Next Page)*

With respect to the Operating Company Defendants' claim that Appellants failed to prove the remaining elements of a successful vicarious liability claim, the trial court found, and our review of the record confirms, that two of the Estate's expert witnesses—Ms. Frederick and Dr. Seignious—testified extensively, either at trial or in depositions, regarding the duty of the employees of Operating Company Defendants, their breach of their duty, causation, and damages. Trial Ct. Op., 1/3/24, at 13-22. In light of this testimony, the trial court concluded that this evidence, "taken together, was sufficient to provide a basis for the jury['s] finding that each [d]efendant's negligence was a substantial factor in bringing about the harm" suffered by Decedent. *Id.* at 22. Simply, the court concluded that "[w]hen viewing the experts' testimony, the testimony of lay witnesses[,] and the documentary evidence introduced at trial as further proof of various duties and breaches thereof, and drawing all reasonable inferences from all of that evidence, there was sufficient basis for a jury to have made its findings that [the Operating Company Defendants' agents or employees] were negligent and that their negligence was the factual cause of [Decedent's] harm and death." *Id.* at 23.

_____

jury to identify the agents or employees of the Operating Company Defendants through whom liability could be imposed on them and to ask the jury to make particular findings as to agency. Trial Ct. Op., 1/3/24, at 23 (citing **Spencer v. Johnson**, 249 A.3d. 529, 556-57 (Pa. Super. 2021) (rejecting the defendant's claim that the burden is on the plaintiff to request a special interrogatory pertaining to agency and vicarious liability); **Cowher v. Kodali**, 283 A.3d 794, 804 (Pa. 2022) (internal quotation marks omitted) (finding that under the general verdict rule, "when a litigant fails to request a special verdict slip that would have clarified the basis for a general verdict, and the verdict rests upon valid grounds, the right to a new trial is waived")).

Following our review, we discern no abuse of discretion or error of law in the trial court's denial of the Operating Company Defendants' motion for JNOV as to its vicarious liability. Our review confirms that the Estate offered ample evidence that agents or employees of the Operating Company Defendants violated the requisite standard of care and that these violations were the factual cause of Decedent's death. *See*, *e.g.*, N.T., 1/18/23, at 177-183, 194-195, 204-05, 207-11, 215, 218-220, 223, 227, 230-31, 239-69, 276-319, 329 (Ms. Frederick's testimony); N.T., 1/20/23, at 15-17, 33, 55-57, 64, 85, 93 (Dr. Seignious's Testimony). Viewing this evidence and all reasonable inferences in the light most favorable to the Estate as the verdict-winners, we conclude that the Estate presented sufficient evidence to prove each of the elements of a vicarious liability claim against the Operating Company Defendants. The trial court, therefore, properly refused to enter JNOV in their favor, and this claim does not merit relief.

***

Operating Company Defendants' Motion for a New Trial

We next address the Operating Company Defendants' claim that the trial court erred in certain of its evidentiary rulings and, thus, abused its discretion in denying their motion for a new trial. In particular, the Operating Company Defendants contend that the trial court erred in admitting two types of evidence. First, the Survey Report, which is a survey that the Pennsylvania Department of Health issues regarding a nursing home's licensure and certification, and second, the Profile Evidence, which is posted on the

Medicare.gov website and whose purpose is "to ascertain that nursing homes facilities are upholding the basic conditions of their licensure and certification" through a "Nursing Home Compare" Five-Star Ratings Profile. Motion re: Survey Reports, 12/1/22, at ¶ 5.

In particular, the Operating Company Defendants argue that this evidence was not probative of the care and treatment rendered to Decedent,[14] unduly prejudicial, and constituted inadmissible hearsay because no one involved in their production testified and the Estate did not corroborate their contents.[15] Vita Entities' Br. at 62-66; Imperial Entities' Br. at 61-65.

"We will reverse a trial court's decision to deny a motion for a new trial only if the trial court abused its discretion." **Vetter v. Miller**, 157 A.3d 943, 947 (Pa. Super. 2017) (citation omitted). With respect to challenged

_____

[14] We note the Operating Company Defendants' reliance on **Temple v. Providence Care Ctr. LLC**, 248 A.3d 464 (Pa. Super. 2021), which is a non-precedential decision of this Court, in support of their general contention that, referring to Profile Evidence, "[c]ourts have held this type of general information about a nursing home is inadmissible as evidence in a claim against a nursing home and, when admitted, give[s] rise for grounds for a new trial." Vita Entities' Br. at 66; Imperial Entities' Br. at 63. We reject this argument because the **Temple** Court did not analyze whether and in what context Profile Evidence is admissible.

[15] The Operating Company Defendants also contend that the admission of this evidence resulted in a violation of their due process rights. Vita Entities' Br. at 62-64; Imperial Entities' Br. at 61, 64-65. We find this argument waived as the Operating Company Defendants did not raise this as a ground for relief in their motions *in limine*. **See** Pa.R.A.P. 302(a) ("[I]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal."); **see also Jones v. Ott,** 191 A3d 782, 787 (Pa. 2018) ("In order to preserve an issue for appellate review, a litigant must place a timely, specific objection on the record.").

evidentiary rulings, a new trial is warranted where the rulings were in error and the error prejudiced the moving party. *Id.*

Questions of evidentiary admissibility, including motions *in limine*, lie within the trial court's sound discretion, and we will not disturb the court's decision absent a clear abuse of discretion. *Parr v. Ford Motor Co.*, 109 A.3d 682, 690 (Pa. Super. 2014). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Keystone Dedicated Logistics, Inc. v. JGB Enters., Inc.*, 77 A.3d 1, 11 (Pa. Super. 2013) (citation omitted).

Further, we note that, "[i]n order to find that the trial court's evidentiary rulings constituted reversible error, such rulings must not only have been erroneous but must also have been harmful to the complaining party." *Oxford Presbyterian Church v. Weil-McLain Co., Inc.*, 815 A.2d 1094, 1100 (Pa. Super. 2003) (citations omitted). An appellant "must therefore show error in the evidentiary ruling and resulting prejudice, thus constituting an abuse of discretion by the lower court." *Id.* (citations omitted).

The threshold inquiry in considering whether to admit evidence is whether the evidence is relevant. Pa.R.E. 402. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable[,] or supports a reasonable inference or presumption regarding a material fact." *Smith v. Morrison*, 47 A.3d 131,

137 (Pa. Super. 2012) (citation omitted); **see also** Pa.R.E. 401.  The court may exclude otherwise relevant evidence if its probative value is outweighed by its potential for unfair prejudice, confusion of the issues, misleading the jury, undue delay, pointlessness, or presentation of cumulative evidence. Pa.R.E. 403.

The trial court first explained that the Profile Evidence and Survey Reports were relevant because they showed that Operating Company Defendants had notice and actual or constructive knowledge "of the fact that Brinton Manor was a low-performing facility based on various objective metrics related to patient care and failed to correct the conditions that gave rise to the low ratings," which was pertinent to the Estate's then-pending claim of corporate negligence against the Operating Company Defendants.  Trial Ct. Op., 1/3/23, at 3.  In particular, the trial court noted that this evidence reflects that management-level agents or employees of the Operating Company Defendants were familiar with, and, in fact, tracked Brinton Manor's "star ratings" and reviews because "that is an important thing for the quality of care and ensuring that the residents are taken care of."  Trial Ct. Op., 1/3/24, at 10.  Thus, the trial court concluded that the evidence was more probative than prejudicial and thus relevant pursuant to Pa.R.E.401.[16]

---

[16] The trial court further noted that, had the Operating Company Defendants requested a limiting instruction, the trial court would have provided the opportunity to cure any potential prejudice with a limiting instruction.  The Operating Company Defendants have not informed this Court whether they requested the trial court provide the jury with a limiting instruction regarding this evidence or if the trial court provided one *sua sponte*.

Finally, the trial court explained that the Profile Evidence and Survey Reports were not hearsay because Appellants did not seek their admission for their truth of the matters stated, but rather to establish that the Defendants had notice of the information in the publications. Trial Ct. Op., 1/3/23, at 3.

Following our review, we conclude that the trial court did not abuse its discretion in denying the Operating Company Defendants' motion *in limine* regarding the Profile Evidence and Survey Reports. It is clear from the record that the trial court found the evidence relevant, and therefore admissible, to address whether the Operating Company Defendants had notice of Brinton Manor's low ratings, which is relevant to establish knowledge of a breach of the **Thompson** duties and, thus, corporate liability.[17] **Corey v. Wilkes Barre Hospital,** 307 A.3d 701, 709 (Pa. Super. 2023)(*en banc*).

Furthermore, we agree that the trial court properly found that the Profile Evidence and Survey Reports were not hearsay, *i.e.*, admitted to prove the facts stated in the report. Rather, the trial court properly admitted them because they addressed whether the Operating Company Defendants had knowledge of the condition of the nursing home.

In sum, we conclude that the trial court properly admitted the evidence and accordingly denied the Operating Defendant Company's Motion for a New Trial.

_____

[17] Although the Estate abandoned its corporate liability claim at the post-trial motions stage, the Estate pursued a claim of corporate liability against all defendants during trial.

***

Compensatory Damages

The Operating Company Defendants next claim that the trial court erred in not ordering a new trial after entering JNOV in favor of the Management Company Defendants. Vita Entities' Br. at 57-62; Imperial Entities' Br. at 57-61. They contend that the trial court should have ordered a new trial on damages because, in nullifying 65% of the liability found against the Management Company Defendants by entering JNOV in favor of them, "it would be speculative to reapportion the liability originally apportioned to Vita and Imperial[]" especially since "the injuries alleged by [the Estate] in this case did not result from a single, identifiable act but from a series of alleged acts by [the Operating Company Defendants] at distinctly different times." Vita Entities' Br. at 60; Imperial Entities' Br. at 60. In support of their claim, the Operating Company Defendants rely on **Maurer v. Trustees of Univ. of Pennsylvania**, 614 A.2d 754 (Pa. Super. 1992) (*en banc)*, **Henze v. Texaco, Inc.**, 508 A.2d 1200 (Pa. Super. 1986), and **Kobylinski v. Hipps**, 519 A.2d 488 (Pa. Super. 1986).

In **Henze**, the plaintiff was injured when a loose threshold caused her to fall at David Rice's Texaco station. The jury apportioned negligence as follows: 35% to plaintiff; 52% to Texaco, the lessee; and 13% to Mr. Rice, the sublessee. On appeal, this Court concluded that the trial court should have granted JNOV to Texaco because Texaco had neither actual nor constructive notice of the unsafe condition at the Texaco station. Then, in

analyzing the effect of the JNOV upon the findings that the plaintiff's causative negligence was 35% and the sublessee's causative negligence was 13%, the Court concluded that "an attempt by a court to reapportion negligence in this case would be speculative[,]" but, because the issue of damages had been "fairly tried" and no party suggested error with respect to the damages issue, "[t]he only issue requiring a retrial is the apportionment of negligence" of the plaintiff and the sublessee. *Henze*, 508 A.2d at 546-47.

In *Kobylinksi*, the executrix of the decedent's estate brought a wrongful death and survival action after the decedent fell to his death in an unguarded exterior stairwell attached to a residence owned by the appellant, a landlord, and leased to a tenant. Following a jury trial, the jury apportioned negligence as follows: 5% to decedent, 20% to the tenant, and 75% to the landlord. This Court reversed the judgment, however, and remanded the case for entry of JNOV in favor of the landlord and for a new trial on the causative negligence of the tenant and the decedent. *Kobylinski*, 519 A.2d at 493.

Similarly, in *Maurer*, a medical negligence action, this Court remanded for entry of JNOV in favor of Dr. Gennarelli, a treating physician, who the jury had determined was 25% liable for the plaintiff's harm, and affirmed the judgment in favor of another physician, Dr. Rogers, and the defendant hospital system, HUP, who the jury had determined were 25% and 50% liable, respectively. The *Maurer* Court then turned to the holdings in *Henze* and *Kobylinksi* to determine the impact that the entry of JNOV had on the amount and allocation of causative negligence against the remaining negligent parties.

The Court found two factors that distinguished this case from **Henze** and **Kobylinski**: (1) the entry of JNOV in **Maurer** "will not leave two parties each of whom was independently negligent, as in the other cases, but rather one party (Dr. Rogers) who was actively negligent and one party (HUP), whose negligence derives from that of the other[;]" and (2) **Maurer** "presents a more complicated case question of damages." **Maurer**, 614 A.2d at 769. The court further explained that in **Henze** and **Kobylinski**, "the entire extent of the plaintiff's injuries, and therefore the entire extent of his or her damages, resulted from a **single, identifiable action**[,]" *i.e.*, falling over a loose threshold in **Hinze** and falling down an unguarded stairwell in **Kobylinski**. **Id.** (emphasis added). The **Maurer** plaintiff, in contrast, alleged that he was injured by two negligent courses of conduct, but the Court found that the appellees failed to prove that one of the courses of conduct was negligent. Given these differences, the **Maurer** Court, thus, found that it was not appropriate to assume the amount of damages should remain the same and simply either reapportion liability or mold the verdict, which would have the effect of cutting in half the award of damages. Therefore, the Court concluded that "the better course is to vacate the judgment and to remand the case for entry of [JNOV] in favor of Dr. Gennarelli and for a new trial on the issue of damages resulting from the negligence of [the remaining defendants]. **Id.** at 770.

Turning to the instant case, as noted above, the jury returned a compensatory damages verdict of $4,000,000 for the Estate, and apportioned

liability as follows: 60% to Vita, 5% to Imperial, 15% to BM-SNF, and 20% to BM Rehab. The jury found from the evidence at trial that Decedent's harm arose not from a single incident of negligence, but from a course of negligent conduct, which it attributed in part to the Management Company Defendants and in part to the Operating Company Defendants.

The trial court then found that the Estate was only pursuing a corporate liability theory against the Management Company Defendants but could not do so as a matter of law. When addressing the impact of the removal of the Management Company Defendants from the jury verdict, the trial court assumed that the jury verdict would remain the same without the Management Company Defendants and, thus, denied their request for a new trial on damages. We disagree.

We find that, like in **Maurer**, it is reasonable to assume that had the Management Company Defendants' conduct not been an issue at trial, the jury's award against the Operating Company Defendants may have been different. Thus, guided by the holdings in **Maurer**, **Hinze**, and **Kobylinski**, we conclude that the trial court erred in declining to order a new trial on damages. We, therefore, vacate the compensatory damages portion of the judgment in favor of the Operating Company Defendants and remand for a new trial on the issue of damages resulting from the Operating Company Defendants' negligence.

***

Punitive Damages

All parties raise claims regarding punitive damages. We emphasize that the Due Process Clause of the Fourteenth Amendment requires a party to receive fair notice of the conduct that will subject him to punitive damages:

> Pennsylvania juries enjoy discretion in the fixing of punitive damages. That discretion is, however, subject to the limitations of the Fourteenth Amendment's Due Process Clause, which imposes limits on punitive awards based on elementary notions of fairness . . . **dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also to the severity of the penalty that may be imposed.**

*Caranci*, 338 A.3d at 172 (internal citations and quotation marks omitted) (emphasis added).

We review an award of punitive damages for an abuse of discretion. *Grossi v. Travelers Personal Ins. Co.*, 79 A.3d 1141, 1157 (Pa. Super. 2013). "Under Pennsylvania law the size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion." *Hollock v. Erie Ins. Exch.*, 842 A.2d 409, 419 (Pa. Super. 2004) (citation and internal quotation marks omitted); *see also Grossi*, 79 A.3d at 1157.

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his[, or her,] reckless indifference to the rights of others. In assessing punitive damages, the trier[-]of[-]fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause[,] and the wealth of the defendant.

***Bert Co. v. Turk***, 298 A.3d 44, 61 (Pa. 2023) (quoting Restatement (Second) of Torts § 908(2)); ***see also Hollock***, 842 A.2d at 419 (citing cases addressing Section 908(2); ***Grossi***, 79 A.3d at 1157 (same). "Punitive damages awards must be tailored to each defendant." ***Bert Co.***, 298 A.3d at 71.

We first address the Operating Company Defendants' claim that the trial court erred in not vacating or dramatically reducing the punitive damages award. Vita Entities' Br. at 43-57; Imperial Entities' Br. at 52-57. The Operating Company Defendants first contend that, as a matter of law, there is no legal basis to impose an award of punitive damages on them because the Estate conceded that it was not pursuing a theory of corporate liability, but only one of vicarious liability and at trial, only requested punitive damages based on a theory of corporate liability. Vita Entities' Br. at 44; Imperial Entities' Br. at 52. The Operating Company Defendants conclude that since "the only basis upon which the jury could have imposed punitive damages on the [Operating Company Defendants] was for their own, direct conduct," and not vicarious liability, there is no underlying theory to support a claim of punitive damages. Vita Entities' Br. at 44 ((citing N.T., 1/25/23, at 148 (where the jury delivered its verdict in open court finding that the "conduct of [the Operating Company Defendants] was willful and wanton or exhibited reckless indifference to the rights of [Decedent] through their own **direct conduct**[]") (emphasis added); N.T., 1/25/23 at 37 (where the Estate argued in closing arguments that "[t]here's something else at play in this case, and it's called

punitive damages. Punitive damages are there to punish [the defendants] for their **corporate conduct**.") (emphasis added)); Imperial Entities' Br. at 52 ((citing the written Jury Verdict Sheet reflecting the jury's answer in the affirmative to the question asking: "Do you find that the conduct of any of the following defendants was willful or wanton, or exhibited reckless indifference to the rights of [Decedent] through their own **direct conduct**?") (emphasis added)). We are constrained to agree.

Our review of the record confirms that the jury was asked to consider whether the Operating Company Defendants' **direct corporate conduct** was willful, wanton, or recklessly indifferent to Decedent's rights. In addition, the attorney for the Estate informed the court at the hearing on the parties' post-trial motions that "[f]or punitives we had conceded we were only seeking for the **direct negligence** for all four [Defendants]." N.T., 6/6/23, at 182-83 (emphasis added). Consequently, because the record also showed that the Estate only pursued a vicarious liability theory of recovery—not a direct corporate liability theory of recovery—against the Operating Company Defendants, and the jury only considered whether punitive damages were appropriate as a result of the Operating Company Defendants' corporate conduct, the Estate is precluded from obtaining punitive damages based on

its theory of vicarious liability. We, thus, are constrained to vacate the award of punitive damages against BM-SNF and BM Rehab.[18]

## Conclusion

In sum, we affirm the judgment in favor of the Management Company Defendants. We also find that the trial court properly denied the Operating Company Defendants' Motion for JNOV on sufficiency of evidence grounds and Motion for New Trial on the grounds of the evidentiary challenges. We, however, vacate the judgment entered against the Operating Company Defendants and order a new trial to determine the amount of compensatory damages to which the Estate is entitled from the Operating Company Defendants. Finally, we vacate the order of punitive damages against the Operating Company Defendants.[19]

Case remanded with instructions. Jurisdiction relinquished.

Judge Olson joins the opinion.

Judge McLaughlin files a concurring and dissenting opinion.

_____

[18] In light of our disposition of this claim, we need not address the Operating Company Defendants remaining claims regarding punitive damages and the Estate's claim that the trial court erred in remitting the punitive damages award against BM Rehab.

[19] In the years since the Pennsylvania Supreme Court last addressed the corporate liability of a nursing home management company in 2012 in *Scampone II*, the corporate structures and financial arrangements of nursing homes and their management companies have evolved. Although the lower courts have addressed numerous issues arising after *Scampone II*, we urge the Supreme Court to provide updated guidance to the bench and bar regarding the application of the principles of corporate liability to nursing home management companies.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>8/4/2026</u>